<u>**AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR**</u>
<u>**TWO SEARCH WARRANTS**</u>

I, Craig A. Graham, being first duly sworn, hereby depose and state as follows:

<u>**INTRODUCTION AND AGENT BACKGROUND**</u>

1.       I make this affidavit in support of applications under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant for the location specifically described in Attachment A-1 of this Affidavit, (the "SUBJECT PREMISES"), and a search warrant for the person described in Attachment A-2, for contraband and evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1591 (attempted sex trafficking of children or by force, fraud, or coercion), which items are more specifically described in Attachment B of this Affidavit:

a.       The hotel room rented to Eric HUTCHINSON on January 18, 2026, and associated with Choicehotels.com confirmation number 14438641, located at the Comfort Inn & Suites Logan International Airport, 85 American Legion Highway, Revere, Massachusetts 02151 ("the SUBJECT PREMISES"), as further described in Attachment A-1;

b.       The person of Eric Joseph HUTCHINSON, as further identified in Attachment A-2;

2.        I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since January 2010. I am currently assigned to the FBI Boston Field Office, Providence Resident Agency. During my time with the FBI, I have led and assisted with investigations of child sexual abuse material (CSAM).  I have received formal training and on-the-job training in the investigation of internet crimes and crimes involving the sexual exploitation of children.  I also have experience in digital extraction techniques and communications analysis.

1

3.      As part of my duties as a Special Agent, I investigate criminal child exploitation and child pornography violations, including the illegal production, distribution, transmission, receipt, and possession of child pornography, in violation of 18 U.S.C. §§ 2251, 2252 and 2252A and crimes related to sex trafficking and other commercial sex offenses in violation of 18 U.S.C. §§ 1591 and 1952. As a Federal Agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

4.      I am familiar with the facts and circumstances of this investigation from: (a) my personal knowledge of the investigation; (b) observations of other law enforcement officers; (c) information provided to me by other law enforcement officials; and (d) information otherwise obtained by credible and reliable sources. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

5.      Based on my training and experience, and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that contraband and evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1591 (attempted sex trafficking of children or by force, fraud, or coercion) are presently located at the SUBJECT PREMISES and/or on the person of Eric HUTCHINSON.

### PROBABLE CAUSE

6.      In late June 2025, FBI's Providence, Rhode Island office ("FBI Providence") received a CyberTip from the National Center for Missing & Exploited Children ("NCMEC") which included text messages between two account users sent over the Tinder[1] application.

---

[1] Tinder is a popular, location-based dating application known for its swipe-and-match feature. Users swipe left or right on potential user profile matches and are "matched" where both users swipe right on each other's profile, this then

7.    The following messages were sent between User Name "Eric," User ID 675ef68a26cb573d780612f6, and User Name "Neena," User ID 683db7c05a433b625d6629d6, indicating that Eric was interested in having sex with females that were between the ages of 14 and 16 years old:

| 06/10/25 1:24pm | Eric | So would you have fucked me when you were 16? |
|---|---|---|
| 06/10/25 1:40pm | Neena | Mmm what happened to the challenge of not cumming inside of me, and yes I would've |
| 06/10/25 2:07- 3:49pm | Eric | What is up with you young teenaged girls and craving sex so badly? It drives me crazy…. cuz you all want older guys and i feel obligated to give them the experience they crave Im mainly referring to the girls younger than you Im sure you have younger friends that want to fuck an older guy Is it bad I think about girls younger than you? I would pay you extra to have a younger friend of yours hoin us in having fun Not saying both of you fuck me at the same time… but we take turns in the bedroom They could be virgins or not virgins and they want to see |

allows the users to chat within the application.

| | | |
|---|---|---|
| | | what sex is like with an experienced older man |
| | | Sorry if this was too much info |
| | | And like i said… if you brought a younger frie d id pay you more |
| | | *friend |
| | | Like $450 |
| | | Then the 3 of us can smoke weed drink and then I take turns fucking both of you |
| | | I'd have no problem if they were 16 or 17 |
| | | Even 15…. id go that low |
| | | But 14 is my cutoff |
| | | No younger than that |
| | | But things won't change for you and i…. you will still end up pregnant eventually with our baby |
| 06/10/25 5:20pm | Neena | Ok I'll try to talk to some girls I know but they don't really date anybody over they're age |

8.    Eric continued to send messages about having sex with Neena and on June 12th, 2025, Neena returned to the subject of involving minor females.  They exchanged the following messages:

| 06/12/25 7:15am | Neena | Hey so I found us two girls that's willing to come do it with us only thing is that they won't do anything unless they get 100$ each on cash app but they want to see proof first.  You don't have to worry about extra money you can give the girls the 100 each and we will plan for his weekend to meet and have fun |
|---|---|---|
| 06/10/25 7:59am | Eric | Wow really?  How old?? |
| 06/12/25 8:18am | Neena | Kaitlyn is 16 and her sister maya just turned 14 |
| 06/12/25 8:18am | Eric | Wow 2 sisters |
| 06/12/25 8:19am | Neena | They do want to see the money before fully agreeing that's the only thing I said to them I'll ask you to send it |
| 06/12/25 8:19am | Eric | They know I'm 47? |
| 06/12/25 8:22am | Neena | I told them a bit about you your age and everything you like to do.  They're down to do with us as long they receive something. And they will 100% do it too. Kaitlyn tried smoking before but if she's like me she'll get high or drunk quickly and her sister just does anything she does |
| 06/12/25 8:23am | Eric | Im guessing they aren't virgins |

5

| | | What do they look like? |
|---|---|---|
| 06/12/25 8:26am | Neena | Kaitlyn had a boyfriend but I don't think it got that far, but maya as definitely a virgin |
| 06/12/25 8:26am | Eric | So I will be popping their cherries |
| 06/12/25 8:27am | Neena | I don't want to send their photos on here give me a phone number I can send them too real quick |
| 06/12/25 8: 28am | Eric | XXX-XXX-9981 |
| 06/12/25 8: 28am | Neena | Yes exactly but they want money before allowing it because it's their first time and they want something too come out of it |
| 06/12/25 8:28am | Eric | I understand they want money |
| 06/12/25 8:29am | Neena | I'll send their photos over now (smile face emoji) |
| 06/12/25 8:29am | Eric | Thanks hun |

9.    In response to an administrative subpoena, Tinder provided the following subscriber information for User Name "Eric," User ID 675ef68a26cb573d780612f6, including the following:

Birth Date: 1977-XX-XX

Email: XXXXX77@gmail.com

Phone Number: 1XXXXXX9981

Position on 06/20/2025 at 12:26:41 GMT: Latitude 41.495, Longitude -71.542

Image:



10.     Review of the provided position above indicated an area in the proximity of South Kingstown, RI.

11.     In response to a Grand Jury subpoena, Google provided the following subscriber information for XXXXX77@gmail.com, the email associated with the Tinder account "Eric"

Name: Eric Hutchinson

Recovery Email: XXXXX77@yahoo.com

Recovery SMS: 1XXXXXX9981

12.     In response to an Administrative subpoena, Verizon identified the subscriber information for telephone number XXX-XXX-9981 as:

Name: Eric Hutchinson

Address: XXX XXXXXX, Chepachet, RI

13.     A review of Rhode Island Division of Motor Vehicles (DMV) records identified the following driver's license photo belonging to Eric Joseph Hutchinson, date of birth

XX/XX/1977, listed address XXX XXXXXX Drive, Chepachet, RI 02814. Hutchinson's date of birth matches the date of birth associated with the Tinder account, and his driver's license photo is visually similar to the image associated with Tinder account "Eric."



14.    A review of Rhode Island DMV records also identified two vehicles registered to Hutchinson, with only one of the vehicles, a 2022 silver Chrysler Pacifica, having an active registration. The Pacifica has a Rhode Island registration of 1IR442 and was observed parked in front of XXX XXXXXX Drive, Chepachet, RI.

15.    Based on the above information, including the similarities in Hutchinson's DMV record and the subscriber information in the subject Tinder account "Eric," there is probable cause to believe Hutchinson was the subscriber and user of the subject Tinder account "Eric."

16.    On August 15, 2025, District of Rhode Island United States Magistrate Judge Amy E. Moses issued search warrants for the "Eric" and "Neena" Tinder accounts (25-SW-281-AEM and 25-SW-282-AEM, respectively). Both accounts contained the conversations detailed above. No further communications between the two accounts were returned. The subscriber information obtained through search warrant 25-SW-281-AEM was the same as that obtained with the previous Administrative subpoena to Tinder.

17.    Tinder provided subscriber information for User Name "Neena," User ID

8

683db7c05a433b625d6629d6a, which included a subscriber email and telephone number. Through subpoenas, open source research, and Massachusetts Registry of Motor Vehicle records, FBI Providence was able to identify the operator of the "Neena" Tinder account as S.G., born in 2006, and a resident of Boston, Massachusetts.

18.     In early December 2025, S.G. was interviewed by the FBI.  S.G. acknowledged using the above Tinder account to communicate with Hutchinson.  S.G. stated that the two minor females were not real and that she had fabricated them in order to get money from Hutchinson. She also stated that following the communication on Tinder, she and Hutchinson communicated through text messages between telephone number XXX-XXX-1461 and telephone number XXX-XXX-9981.  S.G. stated that she sent images of two girls she found on the internet to Hutchinson claiming they were her 16- and 14-year-old friends.  S.G. also stated that Hutchinson paid her $200 through CashApp for the purpose of having sex with the two female minors.

19.     S.G. did not possess the cell phone associated with XXX-XXX-1461, advising that the phone belonged to her ex-boyfriend who resides in Memphis, Tennessee, but had been visiting her in Massachusetts when they were initially communicating with Hutchinson.[2]

20.     On or about December 9, 2025, S.G.'s ex-boyfriend was located in Memphis, TN, and provided consent for FBI agents to record the text messages that had been exchanged between telephone number XXX-XXX-1461 and telephone number XXX-XXX-9981.

21.     A review of those text messages indicated that the two telephone numbers exchanged text messages from June 12, 2025, to November 10, 2025.  The below text messages

---

[2] It is believed that Hutchinson's ex-boyfriend may have engaged in later communications with Hutchinson as S.G., without S.G.'s presence.

occurred on June 12, 2025, initiating at approximately 8:43am.  They indicate that Hutchinson

paid $200 to S.G. for the purpose of having sex with the two minors:

| | |
|---|---|
| XXX-XXX-1461 | [two images of a clothed minor female]<br>This is maya |
| XXX-XXX-9981 | She is cute |
| XXX-XXX-1461 | [three images of a clothed minor female]<br>This is Kaitlyn she's so pretty |
| XXX-XXX-9981 | Wow<br>They understand there will be no condoms? |
| XXX-XXX-1461 | Just let me know before 10:30 if you'll go ahead and send it over so I can tell them this weekend. They're at school right now and they are going to be doing stuff over the weekend but they will come if you let us by 10:30<br>I told them it won't hurt at all and it's really fun and it's normal for no condom so yes they understand |
| XXX-XXX-9981 | We could even make this a regular thing<br>Every weekend is you… but they come with you every other weekend |
| XXX-XXX-1461 | Ok yeah sounds like fun! You know they're growing girls they want to buy things they're parents won't let them buy that's why they're so okay with it |
| XXX-XXX-9981 | Then I want him to fuck both your friends at the same time |
| XXX-XXX-1461 | Wow what an experience for him and you. Do you want me to give the girls any drinks so they can handle a lot of fun and you can get the most use with them? |
| XXX-XXX-9981 | I wish I could date the 3 of you |
| XXX-XXX-1461 | But I know it will hurt so I'll comfort them and hey you might be able too date us it's just maya is still like a baby so she will have sex it's just she might not date. But if you send over the money I know maya will be so happy and actually want to do it more. She has this phone she's saving for so I know she'll be excited |
| XXX-XXX- | Until their parents wonder where they are getting the money to buy |

| | |
|---|---|
| 9981 | things lol |
| XXX-XXX-1461 | Kaitlyn is going to start a job in month and she's very sneaky. She's said she'll hold onto it for her sister and just buy it for her and add it to her paycheck as if the job payed her the extra 200 |
| XXX-XXX-9981 | Nice<br><br>Im gonna end up coming hard in them |
| XXX-XXX-1461 | Okay they won't even notice it either lol. Text me if you'll send it over to Kaitlyn's cash app before 10:30 they have soccer and cheerleading later and will be with their mom after so I can't call or let them know after |
| XXX-XXX-9981 | The slippery cum will make it feel so good for them<br><br>Yes I am going to send the $200<br><br>So they are fine having you next to them as I fuck them? |
| XXX-XXX-1461 | Ok Kaitlyn's cash app is [CashApp account name] you can send directly to her so she knows you're being serious about this |
| XXX-XXX-9981 | I need to see if my cash app is working<br><br>I haven't used it on my new phone yet |
| XXX-XXX-1461 | I'll explain it more to her as soon as you text me you did that. I'l go and call her right now her lunch is starting soon so I'll tell her some more but she is definitely down and fine with it<br><br>She'll give maya 100$ and maya will definitely be fine with it. They're super close to me and I help them out with things so they'll trust me and actually feel safer with me there and if they see I'm doing it with you they'll join |
| XXX-XXX-9981 | Wow<br>Im about to send the money and I get this message<br>[Image that appears to be a screenshot of a message that reads "This might be a scam"]<br><br>I don't use cash app much so I have never seen this message before |
| XXX-XXX-1461 | Everybody gets those messages what's your cash app I'll show you it says that for everyone. That's one thing I'm not is a scammer these are my girls and I'm more than real |
| XXX-XXX-9981 | I trust you hun<br><br>Hold on<br><br>[Image that reads "You sent $200 to Kaitlynn Boxley"] |
| XXX-XXX-1461 | Alright I'm going to let her right now to go and look at her cash app. I'll get back to you in a couple minutes! |
| XXX-XXX- | K |

| 9981 | Now im trying to figure out how things will happen for all of us<br>Do we all just hang on the couch and play video games while the 3 of you take turns riding me?<br>I'd want to eat all of you out too<br>Or do I take one at a time into my bedroom<br>But I think you wanted to coach them through getting their cherries popped<br>I just wasn't expecting you to find 2 girls |
|---|---|

22.     The messages continued between telephone number XXX-XXX-1461 and telephone number XXX-XXX-9981 on June 12, 2025.  XXX-XXX-1461 asked for an additional $100 stating that "Kaitlyn" wanted the full original $200 amount and that the additional $100 would be for "Maya."  XXX-XXX-9981 stated in messages that he attempted to make the transfer, but that his bank had blocked it.  The messages from XXX-XXX-9981 continued into July but XXX-XXX-1461 ceased replying.

23.     On August 28, 2025, XXX-XXX-9981 reinitiated text messages with XXX-XXX-1461.  In the following messages, they discussed the two minor girls and the involvement of Hutchinson's 15-year-old son.

| XXX-XXX-9981 | I was going to give you $1000 more |
|---|---|
| XXX-XXX-1461 | Is the offer still up |
| XXX-XXX-9981 | Seems like you and your friends weren't up to it<br>You went stone cold silent |
| XXX-XXX-1461 | I was waiting to hear back from you Kaitlyn was so excited too and she was ready |
| XXX-XXX-9981 | The funny thing is… I successfully sent you $$$ but apparently me having fraud issues was enough to stop talking to me<br>Waiting to hear back from me????<br>[screen shot of their previous conversation where XXX-XXX-9981 messaged "Hi" and XXX-XXX-1461 did not reply]<br>"Hi" |

| | |
|---|---|
| | "Hi"<br>And just silence from your end |
| XXX-XXX-1461 | the rest wasn't sent for her that was the only reason it's still the summer and the girls don't have to go back to school for another 3 weeks they asked when you would you want to do this and when the money would be sent but I just assumed you might not be interested anymore<br>I'm still down and I know for sure the girls are definitely down we would have had a lot of fun (heart emoji) |
| XXX-XXX-9981 | I was interested but it was also seeminly like a scam cuz your only concern was the money<br>My concern was actually meeting you and not just taking all my money and disappear<br>There was a lot of faith form my side… giving you money out of nowhere and then you girls demanding more |
| XXX-XXX-1461 | not me baby you only sent the 200 for Kaitlyn I want to do this with you and the girls but disappearing was never my intentions sorry if it was weird. We can always send you proof but I'm really sorry that it was a while |
| XXX-XXX-9981 | And when u found out you couldn't get more that instant… but bye lol<br>*buh Ibye |
| XXX-XXX-1461 | Not true but whenever you want to do this foreal this time let me know you can send the rest and we can make this happen even this weekend they stayed over that week you was supposed to come by and you never did you took a long time to respond and text us |
| XXX-XXX-9981 | So I have another interesting twist |
| XXX-XXX-1461 | What's that? |
| XXX-XXX-9981 | To eventually get my son involved |
| XXX-XXX-1461 | Ok sounds fun how old is he? |
| XXX-XXX-9981 | 15 |
| XXX-XXX-1461 | What do you want him to do, let me know how you want it to play out? |
| XXX-XXX-9981 | You could be his first while I am the first for your friends |

13

| | |
|---|---|
| XXX-XXX-1461 | Omg lol he wouldn't be able to handle me (: but it sounds fun only if you want me to teach him |
| XXX-XXX-9981 | Then I want him to fuck both your friends at the same time |
| XXX-XXX-1461 | Wow what an experience for him and you. Do you want me to give the girls any drinks so they can have a lot of fun and you can get the most use with them? |
| XXX-XXX-9981 | Teach him and make him explode in you |
| XXX-XXX-1461 | Mmmm yes (smile emoji with heart eyes) okay baby |
| XXX-XXX-9981 | Think you could handle it |
| XXX-XXX-1461 | Of course<br>He's gonna love my body (: |
| XXX-XXX-9981 | Yeah we can get the girls heavily buzzed/almost drunk<br>Send me your pic again<br>Im gonna explode in you too |
| XXX-XXX-1461 | Ok I'll send you some more photos right now give me one sec baby |
| XXX-XXX-9981 | Ok hun |

24.    The messages continued between telephone number XXX-XXX-1461 and telephone number XXX-XXX-9981 with the last messages occurring on November 10, 2025. In these messages XXX-XXX-9981 continued to describe having sex with the minor females and inquired about additional minors as young as 12 years old.

| | |
|---|---|
| XXX-XXX-9981 | You know what would be amazing… having you ride me and then Kaitlyn and Maya walk in the room after they changed into their cheerleader uniforms… with no panties on<br>I end up cumming in you so hard |
| | After I cum in you.. my cock would be all slippery with my cum and we have Kaitlyn climb up on me and she feels my slippery cock slide right effortlessly and pops her cherry<br>Maya watches and starts rubbing her clit, imagining what my cock |

14

| | must feel like inside<br>So do you have other friends younger than you?<br>Or maybe Maya has a younger friend that wants to experience sex<br>I would say 13 or 12 is the limit<br>And I want you there to help them with their first experience<br>You would be their mentor<br>And of course… I wanna get you pregnant badly<br>Make my son cum hard in you… no condom |
|---|---|

25.     No further messages were exchanged between telephone number XXX-XXX-1461 and telephone number XXX-XXX-9981 until on January 4, 2026, FBI Providence was notified by S.G. that Hutchinson again texted the XXX-XXX-1461.  S.G. provided a screenshot of the following text message sent by Hutchinson to XXX-XXX-1461, which was still in the possession of S.G.'s ex-boyfriend:

| XXX-XXX-9981 | Good morning<br>I still want you to hook up with my son |
|---|---|
| | And I will pay you<br>Im sure you wouldn't be bored with a throbbing rock hard 15 year old sliding in you<br>We can start with $750<br>If this is ok |

26.     On the same date, FBI Providence contacted S.G.'s ex-boyfriend and directed him to provide the telephone number of an FBI Online Covert Employee ("OCE").  The number was provided, and all known future communication was conducted between Hutchinson and the OCE who was posing as S.G. or "Neena."

27.     Communication between the OCE and Hutchinson continued, and Hutchinson continued to express a desire to have sex with the two minor females.  Hutchinson and the OCE discussed meeting at a hotel, and Hutchinson sent photos of a proposed hotel.

15

28.    On January 6, 2026, Hutchinson sent the following text messages:

| XXX-XXX-9981 | Its so fucking hot thinking about my 48 year old cock entering 14, 16, and 19 year old pussies<br>I think its a great match up<br>Honestly I think girls are ready for sex way before 18 |
|---|---|

29.    And on or around January 8, 2026, Hutchinson and the OCE exchanged the following text messages:

| XXX-XXX-9981 | Is it bad I like even 14 like maya<br>I used to say if they bleed they are old enough for me… but now girls are getting their periods at 9 or 10 lol |
|---|---|
| OCE | lol u into that young? Or just 14 and up |
| XXX-XXX-9981 | Just 14 and up<br>Maybe 13 if she really wants to fuck but 14 normally<br>I think i might end up pretty close with Maya as she has more years of fooling around with me before leaving high school |

30.    On January 16, 2026, Hutchinson suggested meeting the OCE and the girls at his hotel in Boston.  Hutchinson explained that on Sunday, January 18, 2026, he would be staying at the Comfort Inn in Revere, Massachusetts because he had work at a nearby college the following morning.  Hutchinson later sent the OCE the following hotel reservation confirmation and made plans to meet the OCE in the hotel's restaurant at 7pm.

16



31.    Based on the communications with HUTCHINSON, there is probable cause to believe that a search of the SUBJECT PREMISES, HUTCHINSON, and the electronic devices found within will lead to the recovery of additional evidence, confirm the users of the above telephone numbers, and will be probative of suspected violations of 18 U.S.C. § 1591 (attempted sex trafficking of children or by force, fraud, or coercion).

32.    Based on all of the above facts and circumstances, I believe that evidence of the

offense(s) under investigation is located, stored or contained at the premises identified or the person identified and described in Attachments A-1 through A-2 of this application for a search warrant.

**SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS**

33.     As described above and in Attachment B, this application seeks permission to search for records that might be found at the SUBJECT PREMISES or on HUTCHINSON, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

34.     *Probable Cause:* I submit that if a computer or storage medium, including a smart phone, is found at the SUBJECT PREMISES or on HUTCHINSON, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

18

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence because special software is typically required for that task.  However, it is technically possible to delete this information.

d.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

35.    *Forensic Evidence:* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium at the SUBJECT PREMISES and/or on HUTCHINSON because:

a.    Data on the storage medium can provide evidence of a file that was once on the

storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.    As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and

malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may

indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.    Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

36.     Based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a.     Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software website, or operating system that is being searched;

b.     Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such

as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c.    The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

d.    Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

37.    Additionally, based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime. This is equally true of so-called "wireless

routers," which create localized networks that allow individuals to connect to the Internet wirelessly.  Though wireless networks may be "secured" (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or "unsecured" (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime—including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network. Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

38.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

### Biometric Access to Devices

39.     It is respectfully requested that this Court issue warrants that permit law enforcement to obtain from the person of Eric Joseph HUTCHINSON the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any

device(s) requiring such biometric access subject to seizure pursuant to the warrants. The grounds for this request are as follows:  I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

40.    If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

41.    If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face.  Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to

Trusted Face.

42.     If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

43.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

44.     As discussed in this Affidavit, your Affiant has reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

45.     I also know from my training and experience, as well as from information found in

publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours *and* the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

46.    Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe HUTCHINSON's fingers (including thumbs) to the fingerprint scanner of the devices found at the SUBJECT PREMISES or on HUTCHINSON's person; (2) hold the devices found at the SUBJECT PREMISES or on HUTCHINSON's person in front of HUTCHINSON's face and activate the facial recognition feature; and/or (3) hold the devices found at the SUBJECT PREMISES or on HUTCHINSON's person in front of HUTCHINSON's face and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to compel that any individual located at the SUBJECT PREMISES state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law

enforcement to compel individuals located at the SUBJECT PREMISES to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.  If HUTCHINSON fails to comply, shall notify the Court so that contempt proceedings can be initiated for failure to comply with the Court's Order.

## CONCLUSION

47.    Based on the foregoing, there is probable cause to believe that the federal criminal statute cited herein, 18 USC 1591, has been violated, and that the contraband, property, evidence, fruits, and instrumentalities of this offense, more fully described in Attachment B, are located at the premises described in Attachment A-1 and/or on the person of Eric HUTCHINSON, who is described in Attachment A-2. I respectfully request that this Court issue search warrants for the location described in Attachment A-1 and the person described in Attachment A-2, authorizing the seizure and search of the items described in Attachment B.

## REQUEST FOR SEALING

48.    I further respectfully request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise

29

seriously jeopardize the investigation.

Respectfully submitted,

_Craig A. Graham (by JDH)_
Craig A Graham
Special Agent
Federal Bureau of Investigation

Attested to by the applicant by telephone in accordance with the requirements of Fed. R. Crim. P. 4.1 by

Jessica D. Hedges, United States Magistrate Judge

on _____ January 18, 2026 _____

30